Good morning, your honors. May it please the court, Carolyn Wiggin from the Federal Defender's Office for Mr. Hansen. Sorry about that. Of my 12 minutes, I will try to save two for rebuttal. And of course, I'm giving eight minutes to the ACLU lawyer, Ms. Eidelman. And I plan to focus on the non-First Amendment issues and leave the First Amendment issues to Abel Counsel from the ACLU. Your honors, I would like to first – Let me just – because I think this might be easier than if we set the time specifically for you. Otherwise, what we see is the other counsel gets a little antsy, and then you overstay your time, and she loses her time. So just remind us again how much time you'll take before rebuttal, before we turn it over to the counsel for the ACLU. So I have a total of 12 minutes. I'm hoping to take 10 for my opening and save two for rebuttal. All right. So we'll set the clock for 10, and that'll just make it easier for you to also see what your time is. Wonderful. Thank you very much. Just a moment while we do that. So we'll set it at 10 minutes. Great. All right. You may proceed. Thank you. Your honors, I would like to start by talking about the jury instruction issue in this case. Your honors, good faith is a complete defense to mail and wire fraud. It negates the specific intent to deceive and cheat. And as is even more clear since this court's decision in Miller in 2020, mail and wire fraud required the intent to cheat. It would be incompatible to have a good faith belief and to have that intent. This was Mr. Hansen's defense theory, and he was entitled to accurate, coherent instruction on that issue. The court gave a confusing instruction on good faith that ended up taking that defense away. The court laid out the concept of good faith, but immediately stated that even if a defendant had that good faith, if they made a false or fraudulent statement, good faith is no defense. Mr. Hansen's jury could have genuinely, could have believed that he genuinely believed in the adult adoption program, but even if he had that belief, if he said something the jury knew was not true, under this instruction they could vote to convict for all the fraud counts. And we contend that is not the law. So what are you doing with Treadwell? Treadwell. Isn't that where the second part of the instruction basically came from? Right. And Treadwell has been overturned by the Miller case, but Treadwell focused on really this question of intent to deceive or cheat, which was the Model Ninth Circuit instruction at the time. It was the Model Ninth Circuit instruction at the time of Mr. Hansen's trial. Miller has now said no, these fraud statutes require deceit and cheating. Now, I don't think the Treadwell case really went into, you know, the details of this good faith instruction. I saw it more as tied to the deceive or cheat. But I do think that that issue is relevant to our appeal, because the defense theory was always that Mr. Hansen genuinely believed in this program. He said things that the jury knew weren't true, that the defense position was that they weren't true, but he believed them. And so now that it's clear under Miller that you have to have that intent to cheat, I think this instruction becomes even more problematic. I would also, I'd like to say. Go ahead. If you say that in the course of this fraud you make false and misleading, you have to make false and misleading statements, that is not in the context of that whole instruction enough to mean deceit and cheating? I mean, you know, the problem is if you have these securities cases and the guy says, well, they weren't going to lose their money in the end because we were doing all these, but we made all these statements and increased their risk, right? So this is a little different, but it increases their risk if you make false and misleading statements in the course of your fraudulent plan. Right. Assuming it is fraudulent. I think in Treadwell and in many cases the defendants try to take the position. We were engaged in, say, a Ponzi scheme, but we hoped that somehow we'd raise the money and pay people back. That is not actually a defense to fraud. They're not saying I really believed I was telling people the truth. They're saying I hoped I could make good on the money. What we're saying Mr. Hansen believed is that he was actually selling a service that could produce citizenship. And so, in his case, if he didn't have the intent to cheat, then the fact that he made a deceptive statement is not enough for fraud, if he really didn't have the intent to cheat. But he's kind of – sorry. Well, that may be. He might have in his head thought, you know, this will all work out, but that added sentence on the injury instruction goes on to say, you have to have intentionally made the false or fraudulent representation or promises to others. So it combines both the fraudulent aspect and the intent aspect there to cabin your good faith argument. So read as a whole, I'm still having trouble understanding where the jury might be misled or where the law is misstated. Now keep in mind, the instruction begins by defining intent to defraud as intent to deceive or cheat. So this jury believes just deception can be defrauding. Well, isn't that right out of the Ninth Circuit model instructions, that first part? Yes, but that, since Miller, has now been changed. Now it says deceive and cheat. And the Ninth Circuit has made clear in Miller that that cheating part really is necessary, and intentional cheating. I think Judge Gould has a question. Let me interject for just, what's the citation? Oh, for Miller? It is in the government's answering brief, and the citation is 953 F. 3rd, 1095 Ninth Circuit, 2020. That's on page 52 of the answering brief. Is that an en banc or? No, that's a panel decision. I didn't understand when you said that Miller had overruled it well. Well, I suppose it. Because like one panel can't overrule another one. True. I'm sorry, I misspoke. It looked at a Supreme Court decision and said, we think Schipse and Treadwell are implicitly overruled. And now we're redefining, we're making clear that going forward, your instructions have to say deceive and cheat, not deceive or cheat. I'm thinking about the kind of false statements that were made here. The false statement that my wife did this and it worked. I mean, that seems pretty integral to the plan to deceive and cheat these people. It's not some kind of collateral false statement. Those are the false statements that were really integral and would generally get people to believe that this would work. Well, Your Honor, I have two responses to that. One is his wife really did go through an adult adoption, and it's not clear that, you know, and especially in light of Mr. Hansen's. I thought she was naturalized. I think she actually, both Mr. and Mrs. Hansen came in on a lottery visa, I believe, and then I think the way they actually became citizens was, I guess, naturalization. But she did go through adult adoption. He has a distorted sense of reality. He focuses on what he wants to. He ignores certain things. She really did go through adult adoption. So one position is what did he really think? The other position is that this could be considered sort of puffery, advertising the service, but if he really believes in the service, I don't think it amounts to wire or mail fraud. I realize I've used up almost all my time, but I think, you know, the rule of completeness, I think Lopez has made clear that the district court took the wrong approach throughout this trial. If information surrounding what the government introduces is used to give context and make it clear, then it's not being offered for the truth. It's not hearsay, and the judge just flatly rejected a lot of what Mr. Hansen wanted to put on under this misunderstanding of the relationship between the rule of completeness and the rule against hearsay. The tapes of the tour Mr. Hansen wanted to give to show at the time of the tour, which would have been April of 2015, his state of mind was that he really believed in this program. The judge kept that out under hearsay, and I think it's pretty clear that it wasn't hearsay. I have used just about all my time, and hopefully I explained the guidelines issues well enough in my brief. I think those are well briefed. Thank you. Thank you. Good afternoon, Your Honors, and may it please the Court. I'm Vera Edelman, appearing on behalf of AMICI, the ACLU, and the ACLU of Northern California. I'd like to reserve two minutes of my time for rebuttal, if possible, so putting my clock at six. Can I ask a question about Miller? I thought in our case it was really not a—I don't think the defendant asked for a charge of deceive and cheat. It was the other part of the instruction that was at issue. Is that correct? I apologize, Your Honor. I defer to Ms. Wiggin on the question about the jury instructions, because I am aiming to focus my argument on the constitutionality of subsection 4. The inducement and the speech part. Exactly. Yes. Sorry. No problem. Thank you. So the law at issue, subsection 4, makes it a felony to encourage or induce a non-citizen to come to, enter, or reside in the United States in violation of the law. But as the Supreme Court has repeatedly made clear, and as this Court made clear most recently in United States v. Rondo, speech that merely encourages someone to engage in unlawful activity is protected by the First Amendment. And for that reason, another panel of this Court was correct to hold that subsection 4 is overbroad in violation of the First Amendment. The government now seeks to have this Court hold otherwise by reading the language of subsection 4 to mean only aid and abet or solicit. But doing so is something that no court can do, because the language of the text cannot be read to mean that. It would violate Congress's legislative domain, and it would remove the incentive for Congress to pass constitutional law in the first place. And that's for two reasons here. First, Congress did not include a specific intent requirement in the text of the law, and cases in this circuit, including Yoshida, preclude application of a mens rea other than knowledge. Second, Congress chose the words encourage or induce, not aid and abet, which it uses two lines below in the same statute, or solicit. It chose encourage, which means to inspire with courage, spirit, or hope, and induce, which means to move another by persuasion. So what do you make, then, of the government's argument that in looking at statutes like this on overbreadth, that our charge and generally our process is to see if they can be construed in a way that doesn't land them in the overbreadth category? So the government suggests that what you're really looking at is a narrow category of speech, and as they put it, that is speech integral to government conduct. So if the speech at issue is integral to government conduct and the statute is construed that way, would it still be overbroad? I think that constitutional avoidance is generally something that courts attempt to engage in, but only when that construction is readily available, when it's readily susceptible to the interpretation that's offered. And here, the speech really isn't integral to criminal conduct, first, for the specific intent reason, and second, because as this court has explained, to constitute speech integral to criminal conduct, generally the speech must be so close in substance and purpose to a substantive evil as to become part of the ultimate crime itself. For aiding and abetting, for example, the elements are, again, specific intent, also that the accused had to have the requisite intent of the underlying substantive offense, then that the accused had to actually assist or participate in the commission of the underlying offense, and finally that the underlying offense actually occur. That's quite a lot to read into two verbs, encourage or induce. And again, as the Supreme Court and this court have recently held, encouraging speech is protected. It's something more and separate from speech that is actually integral to or necessary to commit a crime. Well, but if in fact the speech that's at issue here was integral to the criminal conduct, wouldn't that then meet the objection and the scenario laid out by the Supreme Court? Mr. Hansen's challenge here was a facial challenge to the law. He argued that it was overbroad in violation of the First Amendment. And so even if, as applied to his speech here, even if his speech was not protected, declining to hold that the law is overbroad in violation of the First Amendment wouldn't deal with the main purposes of the overbreath doctrine, namely the chilling effect on others not before the court, family members who are having very personal conversations in moments of crisis, individuals who are pushing at public rallies for changes to our immigration system, and even immigration attorneys who are giving their clients accurate advice about their likelihood of ability to change or adjust their status if they're residing in the United States versus if they leave the country, something that the government made clear in United States v. Henderson, a district of Massachusetts case, that it would in fact prosecute under subsection 4. And I think it's worth noting that the government construes the law narrowly here, but that isn't something that it itself holds to in other prosecutions. These other prosecutions, this was encouraged meant to commit a civil violation. That's right. And I believe in that case it was to stay in, to reside in the country, which is right. Yes, overstay. Oh, yes, and I believe I'm out of— Because that leads me to my question, which I guess is on the second prong, or is that how do you judge what is substantial conduct, substantial protected conduct, which is being addressed? It seems to me that there is something that's being covered which would be encouraged to commit a civil violation, which is probably protected conduct. But is it substantial? Is that a substantial part of what's prosecutable under this statute? It is substantial in that it's the language of the statute, encourage or induce. It is exactly what the statute is targeting. And the plainly legitimate sweep of the law is quite limited, especially looking at the rest of subsection 4, which prohibits bringing, moving, transporting, harboring, hiding, shielding a nonresident, attempting or conspiring to do the same, and even aiding and abetting any of those acts. It's also illegal under U.S. law, as is made clear by this prosecution, to engage in mail or wire fraud and any number of other types of speech that may seem intuitive for Congress to have covered here. But that isn't what the statute actually made illegal. Congress chose the words encourage or induce, which is protected speech. And I am at this point quite over the time that I had hoped to reserve for rebuttal. All right, thank you. Unless Judge Gould has any questions? No questions. All right. We'll hear them from the government. Good afternoon, and may it please the Court. Katherine Leiden for the United States. I will be arguing the trial issues on behalf of the government for 12 minutes. My colleague, John Pelletieri, will argue the constitutionality of Section 1324. Can I ask you the question I tried to ask the other lady? I thought that the big dispute was over this last part of the jury instruction, and there really wasn't any argument in this case about deceit and cheat, or deceit or cheat. That's exactly right, Your Honor. Okay, thank you. And I was planning on starting with the jury instruction, where the Court spent most of its time. Now, the first part of the jury instruction was the model instruction at that time? Yes, Your Honor. And then the judge added the following sentence or two sentences about the good faith, correct? That's correct. All right. The jury instruction that a defendant does not act in good faith if he intentionally makes false or fraudulent statements to others is a correct statement of the law. Very similar wording has been approved by this Court in Treadwell, which was not overruled with respect to that statement. And very similar wording is part of the model jury instructions of four other circuits and a commonly cited federal treatise. Hansen himself advocated for the wording change in that contested portion of the jury instruction that he now advocates on appeal is error. And the other jury instructions further support it, that the fraud convictions must be predicated on knowing intentionally false statements. So first, with respect to the point that the jury instruction was a correct statement of the law, as was discussed a few minutes ago, that jury instruction came merely verbatim from Treadwell, which, again, has never been overruled with respect to the sentence Hansen disputes. The Treadwell facts concern a Ponzi scheme, and it's actually remarkably analogous to this case. So the defense in Treadwell was that the Ponzi defendants, although they misled their investors as to the nature of the corporation's earnings that they were asking the investors to invest in, they always believed the investors would make money in the end. And this Court affirmed a very similar instruction, holding that through those lies, the Ponzi defendants intentionally deprived the investors of the opportunity to decide for themselves on the basis of true and accurate information whether or not to invest. And this Court held that that is all that an intent to defraud under the wire fraud statutes require. And similarly here, Hansen's defense was that he believed, implausibly, but his defense was that he believed that he could make people citizens through adult adoption. But what that jury instruction says, correctly, is that if Hansen induced investors or victims to participate in his adult adoption program by intentionally lying to them that he had made people citizens before through adult adoption, he intentionally deprived them of the opportunity to decide whether they wanted to pay him up to $10,000 to become citizens through adult adoption. And that by doing so, he intended to cheat them, and that that is all that wire fraud requires. Extremely similar instructions are run-of-the-mill and common. As this Court has noted in approving the language in Treadwell, other circuits have nearly identical provisions in their model intent to defraud instructions. The 1st, 6th, 7th, and 11th circuits have patterned jury instructions with extremely similar wording. And as does the commonly used treatise. And it's often given here, as in here, in combination with a good faith instruction. And that makes sense that those are combined. Because no matter what you believe, you can't get people's money by lying to them. The defendant cites no case that this basic, common instruction is an incorrect statement of the law. Hansen's argument that the instruction permits conviction based on an honestly believed statement is correct, or incorrect. The instruction explicitly requires, as was flagged a few minutes ago, that the defendant, quote, intentionally make false representations or promises to others. And the other jury instructions further supported that conviction must be predicated on intentional, knowing false statements. Specifically, the knowing instruction, which is part of the elements of wire fraud. The defendant cannot have acted by mistake or accident if he believed that adult adoption was a path to citizenship. And that were the only false statement charged, that mistake would be a defense. As this Court wrote in Moran, even if there were some ambiguity here, even if the wording of that particular sentence were not perfect when examined under a microscope, were the instructions as a whole adequately made clear to a jury that the fraud counts required knowing intentional false statements, there is no error. I'll also point out that Hansen invited this change in wording. He got what he wanted. So Hansen advocated for changing the phrasing of that last sentence from knowingly makes false statements to intentionally makes false statements. And on appeal, the sole argument appears to be that that omission of the word knowingly elided the requirement that the defendant know that the statement be false. Hansen should not be heard to challenge the lack of a word that he himself was responsible for removing. Any and while there was no error, any error also would have been harmless. The evidence was overwhelming that Hansen knowingly made those two false statements. And with respect to the statements that Hansen had made people citizens before, Hansen admitted on tape with officers that it had never worked before. When officers confronted him with the fact that he the program had never worked, he said, you're dead right on that. And that's government exhibit 3408. Hansen's own mental health expert also testified that Hansen would know what he has and hasn't done. Just like anybody else. Hansen doesn't suffer from some sort of delusion or an inability to understand reality that would lead to a belief that he'd spent the past few years making people citizens. When, in fact, he hadn't. There is no evidence, according to Hansen's own expert, that he was unable to understand reality. With respect to his wife, Viola. I'll just explain the history on that a little bit. Hansen and his wife both got their citizenship through DV1 and DV2 visas starting in 1999. Then, after a period of time as permanent residents, they did both naturalize as United States citizens. Hansen filled out his wife's I-130 petition and submitted it. He never mentioned, although she was adopted as an adult, he never mentioned the adult adoption in the I-130 petition because he knew it didn't matter. There's also ample evidence that Hansen knew that the second big lie was a lie. That he knew full well that adult adoption was not a path to citizenship. You're doing all the trial issues, right? You know, there obviously is an evidentiary ruling that was incorrect. State of mind is an exception to the hearsay rule. Your Honor, I actually interpret the judge's comment that I believe you're alluding to differently. Okay, what did he mean? Because I assume he's been on the bench for a while. I assume he knows that state of mind is an exception to the hearsay rule. So what was going on there? Of course, Your Honor. He was just, after listening to the defendant's argument for the admission of, I believe this is the tour recordings, he was saying- The one I thought, well, we have the Joseph of Egypt, that, I think it was that, was it that statement that provoked the, that's just hearsay? I believe that what you're referring to is, he said both were hearsay. And they were for different reasons. But I think you may be referring to the statement that, with respect to the tour recordings, that it is straight up hearsay, period. Okay. And the reason you're offering it, he said, is to show his state of mind at the time. And you really, you can't show that. The district court there, after listening to all this argument, was not saying he didn't know about the existence of the exception to the hearsay rule under Rule 8033. He was saying he rejected the defendant's argument that it applied. Well, the tour itself, I'm not sure what it adds. Was there any dispute that he actually gave that tour to federal officials? No. Did that come out in the trial, that this tour happened? Yes. So, exactly what happened during the tour, I'm not sure how relevant that is. You're right, Your Honor. It wasn't relevant. And there are three reasons why it shouldn't come in, and the district court's ruling is correct. So, with respect to the tour, the district court didn't abuse its discretion in concluding that hearsay, it was hearsay, and it was not within Rule 8033, and excluding the nine audio recordings that Hanson offered himself, giving a carefully planned tour to USCIS officials, purportedly to show his state of mind. So, first, the defense offered the recordings to show his belief in the program, which is outside the text of Rule 8033. It explicitly cabins off. It cannot be used. The exception cannot be used to show belief. Second, Hanson carefully planned the tour. After being called in to the office of a fraud investigator, Nisaly, and told that adult adoption was not a path to citizenship, it was after that that Hanson embarked on this tour and invited that particular fraud officer to come to his facilities. He had time to plan. He had time to fabricate. And that element of preplanning takes it outside of Rule 3033. And third, you're exactly right, Judge Osani, that Hanson's state of mind the day of the tour had no particular relevance to the three-year fraud charge. The defense has not offered any statements. They have not proffered any statements. They haven't lodged a recording to the court, even, in arguing that there was anything said on that call that could get in for a legitimate purpose. Okay. Joseph of Egypt was out because it wasn't needed for completeness. I don't understand why Joseph of Egypt was out. That's correct, Your Honor. It wasn't needed for completeness. Was it at a later part of the recording? Correct. So the government introduced a very short segment at the very beginning of the call, about nine lines, where Hanson, on a call with his bishop, admitted that he knew he would end up here, meaning in jail, because he took the whole thing too far. And then after, on the next page, Hanson said that he had been reading Joseph of Egypt. I keep reading through Joseph of Egypt. So that's just a statement he was reading the Bible. He doesn't compare himself to Joseph of Egypt or modify that prior discreet sentence. So I observe my time has expired. But if the court has no further questions, I would ask the day of trial. Thank you. Thank you, Your Honors. I may have pleased the court, John Pelletier on behalf of the United States. Mr. Hanson and his amici do not make the substantial showing required to justify the extraordinary remedy of facial invalidation of 1324, subsection 4. The encouraging and inducing prong of subsection 4 is a conventional prohibition on aiding and abetting and solicitation. Is there argument that we have aiding and abetting in another place in the statute? Your Honor, that pertains to aiding and abetting a violation of subsection 1 through 4. It doesn't cover simply aiding and abetting someone who either enters, comes in, or resides in the United States illegally. So that provision for aiding and abetting on subsection 5 does not cover the encouragement and inducing prong of subsection 4. I agree with that, but Congress obviously knew how to say aiding and abetting. So what I understand the government to be doing is to say, well, this is tantamount to that. Encouraging or inducing is a tantamount to aiding or abetting. So if we substitute those words, then the statute escapes constitutional challenge. But how could we do that when those aren't the words? I think our argument is a little bit different, Your Honor. All right. Our position is that Congress and statutes for many years, decades, and centuries perhaps, have used many verbs to encompass the idea of aiding and abetting and solicitation. Those verbs include encourage and induce. Among others, so for example, 18 U.S.C. 2 includes the word induce. We cite the Lefauve Treatise that goes – many state statutes that use various verbs. And encourage and induce have long been used to encompass and cover criminal aiding and abetting and solicitation. Okay, that's where – can I ask – I'm a little confused by aiding and abetting. I always thought that went with criminal violations. Do you have an example of aiding and abetting of a civil violation? Your Honor, you're right. So typically, so for example, in 18 U.S.C. 2, it covers aiding and abetting facilitating a criminal violation. And in that respect, we do agree that subsection 4 is slightly broader than your typical aiding and abetting. Now, that's not to say we do still believe that encourage and induce mean aiding and abetting, but it can be aiding and abetting either a civil or a criminal act. Now, the question then is, given that scope, does it cover protected speech under the First Amendment? And the answer to that is no, going back to the Ghazan case in the Supreme Court. So in the Ghazan case in the Supreme Court, applied Gibney, which is the first case to kind of articulate this notion of speech integral to illegal conduct. And in both in Gibney and in Ghazan, you had picketers who were trying to induce companies and employers to engage in conduct that would violate a statute. In Gibney, it was a criminal statute. And in Ghazan, it was a civil statute. And the Supreme Court specifically said in Ghazan it did not matter that the petitioner in Ghazan was attempting to induce a violation of the civil law. It said that was not a basis to distinguish Gibney. And that the speech there, the picketing, which was intended and did induce illegal civil illegal conduct, was unprotected under the First Amendment. And then later in Pittsburgh v. Press, the Supreme Court confirmed that. In that case, a civil ordinance made it illegal to discriminate in employment. And a newspaper facilitated that violation of that ordinance by permitting advertisers to put their advertisements under either a male or a female column. And the Supreme Court said that the newspaper's conduct there by using – by doing these columns was not protected speech. And Williams, which dealt with criminal facilitation, specifically cited Gibney and Pittsburgh v. Press for the idea that offers to engage in illegality are not protected speech. So let's imagine – let's imagine immigration advocates at the border, and there's been a surge at the border from some particular country. And so the advocates are first addressing them cross-border, encouraging them to come in. And they, of course, know that not everybody has a legal right to come in. Some may have criminal violations. Some may be reentry. Some may have some other disqualifying thing. But they're saying to everybody, come on over. So now they come on over, and now we're all in the U.S., so we don't have any extraterritorial conduct. And the immigration advocates are saying, you know, now you're here, and you should all stay here. And, in fact, you may have rights here. But in our view, you all have a right to stay here because of X, because of the kind of persecution that went on in your country, the upheaval, the geographic dislocation or whatever. So how is an immigration advocate to know when he or she steps across the advocacy line and into encouraging and inducing? Well, I'll explain. But I'll first make the point that drawing the line is inherent in every aiding and abetting statute, no matter what it reaches. So it's illegal to aid and abet drug possession. It's illegal to aid and abet firearm possession. Those are also contentious issues with many advocates on both sides of it. And aiding and abetting is not protected, even if it's implemented, through wholly or partially through speech. Well, it's the person that – I'm going – I understand all of that. Yes. But now we've got these immigration advocates who are very active on the border or elsewhere, and they need to know when they're going to cross the line because, presumably, fair notice is given. Yes. How do you know? What I just said, is that criminal conduct or not criminal conduct? Well, obviously, it's contextual. But based on what you've said, it does not sound like it would be – it would not be criminal conduct under typical aiding and abetting standards, which require, quote – I mean, there's been a number of formulations, but they require an affirmative act in furtherance, quote, active participation. Those are in the Rosemont decision from the Supreme Court. See, but here's kind of where I have to draw the line, because I understand if it said aiding and abetting, then I think the advocate would be getting side legal advice like, you know, don't be offering to basically do an act in furtherance or, you know, bringing them over or doing whatever, harboring these people. But instead, the person is there, and I'm just encouraging. I'm just encouraging them. Right. So it seems to me that your argument does rely on us translating encouraging to be aiding and abetting. But let's just say it's not. Let me just have you assume aiding and abetting is not what the statute says, and we're not going to read that in. What about encouraging? How does encouraging speech get drawn the line in terms of illegal speech versus legal exercise of the First Amendment? Yes, so encourage, just the word encourage, in total isolation, under dictionary definitions, could have a capacious meaning. But it does not have that meaning in this statute. There are textual features of this statute that indicate it has a much narrower meaning and the same narrow meaning that facilitation has generally and the word encourage has generally in the aiding and abetting statute. So in this case, this court's decision in Barnett equated aiding and abetting with encouraging, and it's the same here. It is limited. The word encourage, as used here, taken together with induce as a package, includes aiding and abetting and soliciting. It's not just aiding and abetting. It's also soliciting. Well, here it's an or. It's not an and. So you either encourage or you induce. So the statute gives you both of those. Induce gets me a little closer, I think, but encouraging leads me a little farther on the other end. And since it's not in the conjunctive but in the disjunctive. Well, this court has equated encouraging with aiding and abetting and induce as well as in the 18 U.S.C. 2. And at a minimum, to avoid constitutional problems, the statute should be construed as those terms having their ordinary criminal law meanings. It's well established that when a term of art, a legal term of art, is transplanted into a statute, it carries with it the prior soil. And the prior soil here are the established meanings of aiding and abetting in the larger context. Induce and encourage, at a minimum, to avoid constitutional problems, should be construed to mean aiding and abetting or solicitation here. And does it matter then whether what you're aiding and abetting is violation of a civil law or a criminal law? No, Your Honor. So this has to proceed in two steps. Number one, what does the statute cover? And here it covers aiding and abetting and soliciting as those are terms of art within concepts, well-established concepts in the criminal law. But it can be either a criminal or civil violation. Now, then, understanding that it covers that and that now has that narrow reach and not the capacious meaning of encourage, then the question is that does that cover protected speech? And as I described, Gazam and Pittsburgh Press, and then as identified in Williams, all established that facilitating and soliciting either civil or criminal illegality are unprotected speech. That's what those decisions establish. And there's also Chief Justice's, I do believe it's dicta, but there's a discussion in Fair v. Rumsfeld where Chief Justice Roberts cites Giboney and says, so, for example, there could be a civil law against discrimination, and that could require someone to prohibit someone from putting a whites-only need-apply sign on their front door. And so that was a civil violation as well. So the Supreme Court precedent going back to Gazam, Pittsburgh Press, Williams, Fair v. Rumsfeld establishes that facilitating and soliciting, aiding and abetting and soliciting illegality, whether that illegality is civil or criminal, is unprotected speech under the First Amendment. Thank you. Thank you. So I believe that you have two minutes for rebuttal. Thank you, Your Honor. I appreciate that. I'm going to try to make three quick points. The first two have to do with the hearsay issues. I want to make clear that the recording involving Joseph and the tour recording are two different incidents, and the rulings were based on two different sort of analyses. So the first recording that involves the invocation of Joseph is a recording that was done after Mr. Hansen had been arrested and was in the Sacramento County Jail. The bishop of his church comes to visit him. These are two men who are part of a religious community that talks about and thinks about the Bible quite a bit. So the government is allowed to take a snippet of that conversation where Mr. Hansen says, I pushed things too far, I knew I'd end up here. They only play that. The defense tries to get in the very next page of that transcript where he says, I've been reading Joseph, you have to take things to this level. Now, what the government was allowed to do was argue in closing that in that recording Mr. Hansen made a straight admission of guilt. Had they heard the Joseph part and understood Joseph is a biblical figure who's jailed for doing something virtuous, they would have understood that Mr. Hansen was simply saying, I was doing something good and virtuous and that's how I ended up in jail, just like Joseph. So it was important under the rule of completeness and it should not have been barred as hearsay. The other recording is the recording of the tour. To make any sense of this, you have to have his testimony that he thought he was doing a good thing, and we have that testimony, right? He testified twice. Twice. So I'm not sure what difference it makes. I'm sorry, I think most people aren't going to know what Joseph of whatever was about. So he would have to testify that I thought I was doing good things, and he did, right? He did, but the government is allowed to use this recording as its evidence of an admission of guilt, right? And if he had been able to, at that time, include the other part, then they could have – I mean, certainly if you read the entire piece that the defense wanted to introduce, you understand this is a man who thinks he's in jail because he did something devout and religiously inspired. So even if you didn't know the story of Joseph, you would understand he's saying, I did this divinely inspired thing, and here I am like other martyrs. Like, that's the point of that conversation. And, you know, the commentary to Rule 106 says we understand, like, it's much more effective when the party opponent has introduced a piece of a recording to be able, at that time, to put in the context so that you don't have this unfair impression and this unfair argument that that was an admission of guilt. The tour recording happens just two months after Mr. Hansen first meets government officials, and it shows that he invited in Department of Homeland Security. You've well exceeded your time, so maybe if you could sum up with a real pithy point as to what you want us to remember. I want you to remember he was boasting about adult adoption to Department of Homeland Security's officials. That shows he genuinely, if, you know, irrationally, genuinely believed in the program. It should have been allowed in. Thank you. Thank you. Ms. Eidelman, we'll give you two minutes for rebuttal. Thank you, Your Honor. So I'd like to start with your question about whether just looking at encouraging speech, if what is the scope of that that is protected and what is illegal, and I would point you to several Supreme Court opinions that hold that speech, that merely encouraging illegal activity is protected. In Ashcroft, the Supreme Court wrote, the mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it. In Claiborne, it wrote, mere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment. Here we're talking about something very far, even from violence. In Williams, it used the example of, I encourage you to obtain child pornography as abstract advocacy that is therefore protected. What would be your response then, just hypothetically, if we were to read encourages or induces to mean aid or abet? Would that change your argument? I don't think it's possible, Your Honor. I think it would be contrary to Congress's intent. No, I'm not asking you if it's possible. I'm telling you that's what we would do under my hypothetical. And in that hypothetical, what then would be your argument if encourage or induces was read to mean aid or abet? I think the argument that that is still not speech integral to criminal conduct remains, as you discussed with opposing counsel. But I think that the more persuasive argument is that encourage or induce doesn't mean aid or abet, because it isn't integral to the criminal conduct. One can induce, for example, an immigration attorney can persuade her clients to remain in the United States simply by telling them that they have a better chance of adjusting their status if they remain in the country. That's persuasive, certainly, but it's not aiding or abetting or solicitation. It does fall within the definition of induce, which the OED defines as leading a person by persuasion, moving, influencing them to do something. So that is all protected speech, as all of those Supreme Court cases show, and as this Court itself held in Rundo where it wrote the First Amendment protects speech tending to encourage or promote a riot. The same must be true for civil and even criminal infractions of immigration law. Thank you. Can I ask a question? I think your co-counsel was talking about Giboney as an example of speech that aids or abets criminal conduct, but he had another case that aids and abets civil conduct. So in that case, I believe he was distinguishing Gazam from Giboney. Giboney, the laws at issue were criminal. In Gazam, there the Court was talking about. How do you spell Gazam? I believe G-A-Z-Z-A-M. And that case is about picketing, which the Court viewed as a mix of speech and conduct. So it's not actually a case about pure speech, and therefore isn't a case about an exception from First Amendment protection for pure speech. Similarly, Pittsburgh Press is about illegal transactions, which, again, is not pure speech. Thank you. That gave me the answer. All right. I'd like to thank all counsel, really, for the very excellent arguments and also the briefing, which is very helpful here. The case of United States v. Hansen is now submitted.
judges: McKEOWN, GOULD, Restani